**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SABRINA GUTHRIE,                           )
                                           )
                        Plaintiff,         )   Case No. 10-cv-03180
                                           )
            v.                             )   Magistrate Judge Cox
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of Social Security,           )
                                           )
                        Defendant.         )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Sabrina Guthrie ("Guthrie"), seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").[2] Guthrie has filed a Motion for Summary Judgment [dkt. 25], seeking a judgment reversing or remanding the Commissioner's final decision. For the reasons set forth below, Guthrie's motion is granted.

I.      PROCEDURAL HISTORY

On July 13, 2006, Guthrie protectively filed an application for DIB, alleging a disability onset date of June 12, 2006.[3] The SSA denied her application initially, and again upon reconsideration.[4] Thereafter, Guthrie filed a timely written request for a hearing, which was granted.[5] On January 8, 2009, a hearing was conducted before Administrative Law Judge ("ALJ")

---

[1] On July 22, 2010, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (dkts. 10, 12).
[2] *See* 42 U.S.C. §§ 416(i), 423.
[3] R. at 159, 235-46.
[4] R. at 199-200, 202-10.
[5] R. at 213.

John K. Kraybill in Oak Brook, Illinois.[6] During the hearing, the ALJ heard testimony from Guthrie, as well as vocational expert ("VE"), Michelle M. Peters, and medical expert ("ME"), Kathleen M. O'Brien, Ph. D.[7]

On February 13, 2009, the ALJ issued an unfavorable decision finding that Guthrie was not disabled under the Act.[8] On June 16, 2009, Guthrie appealed the ALJ's determination to the Appeals Council of the SSA.[9] After refusing to consider new evidence submitted by Guthrie,[10] the Appeals Council denied Guthrie's request on February 24, 2010, making the ALJ's ruling the final decision of the Commissioner.[11] After being granted an extension of time to file a civil action,[12] Guthrie timely filed the instant action on May 24, 2010.[13]

## II.     STATEMENT OF FACTS

We now summarize the administrative record. We set forth the general background evidence concerning Guthrie's history and medical complaints, followed by the objective medical evidence considered by the ALJ. We then discuss the hearing testimony, before addressing the ALJ's written opinion.

### A.     Introduction and Medical Evidence

Guthrie was born on April 8, 1977, making her thirty-one years old on the date that the ALJ

---

[6]  R. at 168
[7]  R. at 168-98, 213.
[8]  R. at 156-167.
[9]  R. at 154-55.
[10]  R. at 5-6.
[11]  R. at 5-7; 20 C.F.R. § 404.981; *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).
[12]  R. at 1-4.
[13]  Pl.'s Compl. (dkt. 6).

issued his decision.[14]  She graduated from high school and completed one year of college.[15]  Guthrie's past relevant work includes several temporary positions as a customer service representative.[16]

Guthrie has been unemployed since May 2007, when her previous employer "let [her] go" after she began experiencing frequent panic attacks.[17]  Guthrie claims she can no longer work due to severe panic disorder, a psychiatric condition characterized by "unexpected episodes of intense fear without circumstances that would ordinarily provoke fear,"[18] and agoraphobia, which is defined as an "irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided."[19]  At the time of the hearing, Guthrie was living with her husband and two school-age children.[20]

We begin our review of Guthrie's relevant medical history on June 12, 2006, the alleged disability onset date.  On that date, Guthrie visited Central DuPage Hospital's emergency room ("ER") with complaints of chest pain, reporting episodes of pain beginning six months earlier.[21]  All cardiac tests were normal.[22]  Guthrie visited the Central DuPage ER again on June 20, 2006, complaining of chest pain that began while she was driving.[23]  Testing revealed no cardiac abnormalities, and Guthrie was prescribed Xanax.[24]  On July 5, 2006, Guthrie was taken by

---

[14]  R. at 228.
[15]  R. at 193.
[16]  R. at 174-177, 193.
[17]  R. at 174-177.
[18]  Dan J. Tennenhouse, MD, JD, FCLM, Attorneys Medical Deskbook 4th § 25:12: Psychiatric disorders characterized by anxiety (Thomson Reuters 2010).
[19]  Stedman's Medical Dictionary, 27th Edition A-10590 (Lippincott, Williams & Wilkins 2000).
[20]  R. at 172.
[21]  R. at 414.
[22]  R. at 415.
[23]  R. at 404-05.
[24]  R. at 407.

ambulance to the ER of Sherman Hospital while complaining of a panic attack.[25] Guthrie reported having previous panic episodes in the prior seven weeks from either driving or being in crowded places, despite her use of the medications Xanax and Paxil.[26] Guthrie was diagnosed with panic attacks.[27] On July 10, 2006, Guthrie was taken by ambulance to the Sherman Hospital ER after suffering a panic attack while car pooling to work.[28] Guthrie was given the medication Lorazepam (Ativan), to be taken in addition to the Xanax she was already prescribed.[29] After this episode, Guthrie sought treatment from a series of psychiatrists.

### 1. Susan P. Levine, M.D.

On July 11, 2006, Guthrie attended an initial evaluation with Susan P. Levine, a psychiatrist at the DuPage County Department of Mental Health Services.[30] At the evaluation, Guthrie reported panic attacks beginning in June 2006, usually occurring in a car, and involving shortness of breath, dizziness, sweating, blurred vision, palpitations, and intense anxiety.[31] Guthrie reported experiencing over 30 such attacks each week.[32] Dr. Levine diagnosed Guthrie with panic disorder without agoraphobia.[33] She prescribed the medications Paxil and Ativan for Guthrie and assigned Guthrie a Global Assessment of Functioning ("GAF") score of 50.[34] For reference, the GAF scale is used by mental health professionals to convey a person's psychological, social, and occupational functioning on a spectrum in which scores between 41-50 indicate serious, 51-60 indicate moderate,

---

[25] R. at 357.
[26] *Id.*
[27] R. at 358.
[28] R. at 339.
[29] R. at 339-40.
[30] R. at 519-21, 600-04.
[31] R. at 519.
[32] R. at 519-20.
[33] *Id.*
[34] R. at 521

and 61-70 indicate mild symptoms.[35]

On July 13, 2006, Dr. Levine noted that she had provided a statement to Guthrie's employer documenting Guthrie's "inability to travel to work."[36]  On August 15, 2006, Guthrie cancelled and rescheduled an appointment with Dr. Levine.[37]  On August 22, 2006, Guthrie was taken by ambulance to Central DuPage ER after suffering a panic attack at home.[38]  She reported that she had not been taking her medication for two days because she felt better, but called emergency services when Ativan did not alleviate her anxiety.[39]  On August 28, 2006, Guthrie was again taken by ambulance to Central DuPage ER for a panic attack, despite using Paxil and Ativan.[40]

On September 9, 2006, Guthrie was partially hospitalized at Central DuPage Hospital Behavioral Health Services due to the "increasing frequency and severity of her debilitating panic attacks," which mostly occurred while Guthrie was driving.[41]  Guthrie reported increased Ativan use, noting that she takes Ativan (in addition to Paxil) before she goes out in public.[42]  She also reported experiencing five or six panic attacks daily, occurring mostly while driving, and lasting between fifteen to twenty minutes per episode.[43]  Guthrie described these panic attacks as involving "[c]hest pain, waves of anxiety, shortness of breath, heart racing, and believing that she is going to swallow her tongue and have a seizure."[44]  Guthrie was diagnosed

---

[35] *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders IV-TR, 34 (4th ed. 2000).

[36] R. at 515.

[37] *Id.*

[38] R. at 400-01.

[39] R. at 401.

[40] R. at 397-99.

[41] R. at 382.

[42] *Id.*

[43] R. at 382.

[44] *Id.*

with panic disorder without agoraphobia, and assigned a GAF score of 40.[45]  She was prescribed Ativan and Lexapro.[46]

On September 21, 2006, Dr. Levine noted that Guthrie had been attending an out-patient therapy group.[47]  Guthrie reported having a panic attack every other day, a significant reduction in frequency.[48]  Guthrie also reported being able to drive twenty minutes at a time, but having to stop and walk around before driving another twenty minutes.[49]  On October 2, 2006, Guthrie received a psychiatric evaluation at Central DuPage Hospital.[50]  She was diagnosed with panic attacks, acute and chronic anxiety, and depression.[51]  Guthrie reported taking Ativan and Paxil.[52]  On October 19, 2006, Guthrie saw Dr. Levine and reported having four panic attacks per week – an improvement – but stated that she was still unable to work for fear of being in enclosed spaces, and unable to drive more than twenty minutes at a time.[53]  Guthrie reported that Lorazepam (Ativan) could "prevent an attack or abort one," and she was willing to take it in spite of the sexual side effects.[54]  Dr. Levine noted that Guthrie's mood was mildly depressed, but her affect was pleasant and appropriate.[55]  She diagnosed Guthrie with panic disorder and assigned a GAF score of 50.[56]  Dr. Levine noted that "significant improvement has occurred but [Guthrie] is still symptomatic and unable to work."[57]

Treatment notes dated November 2, 2006, indicate that Guthrie was taking Lexapro and

[45] R. at 383.
[46] Id.
[47] R. at 515.
[48] Id.
[49] Id.
[50] R. at 368-74, 386-96.
[51] R. at 371-72, 392.
[52] Id.
[53] R. at 516.
[54] R. at 517.
[55] Id.
[56] Id.
[57] Id.

Ativan for her anxiety disorder.[58]   On November 9, 2006, Guthrie reported a substantial improvement in the frequency and intensity of panic attacks; her symptoms had reduced to one panic attack per week.[59]   Guthrie also reported no longer taking Lorazepam (Ativan).[60]   Dr. Levine noted Guthrie's "substantial improvement" and that Guthrie's sexual side effects were gone.[61]   Dr. Levine advised Guthrie to continue on Lexapro.[62]

The record reflects that, on November 14, 2006, Guthrie submitted a formal application for Social Security benefits,[63] which was given a protective filing date of July 13, 2006.[64]

On December 7, 2006, after being assigned a new psychiatrist, Guthrie sought treatment from Dr. Levine for the last time.  Guthrie reported significant progress with only two panic attacks in the past month, each lasting about fifteen minutes.[65]   However, Guthrie was still unable to drive or ride in the front passenger seat of a car.[66]   Guthrie's mood was described as euthymic, with a pleasant affect.[67]   Her dosage of Lexapro was increased.[68]

### 2.    Counselor Pamela Lambur's Initial Evaluation

On November 27, 2006, Guthrie was evaluated by mental health counselor Pamela Lambur

---

[58]  R. at 420.
[59]  R. at 511.
[60]  *Id.*
[61]  R. at 512.
[62]  R. at 512-13.
[63]  R. at 235-46.
[64]  R. at 159.
[65]  R. at 508.
[66]  R. at 508.
[67]  R. at 509.
[68]  R. at 510.

and assigned a new psychiatrist, Bhargavi Devineni.[69]  Counselor Lambur noted that Guthrie was having "ongoing symptoms of anxiety and panic attacks that impair her ability to function fully in all roles," and was having "difficulty leaving the house due to anxiety."[70]  Guthrie reported that she could no longer be around crowds, lost her appetite, didn't want to talk, just wanted to lie down in her room by herself, was fidgety, could not be outside her home or drive due to anxiety, had lost twenty-four pounds in two months, and must always be accompanied by a family member.[71]  Guthrie also reported a history of sexual abuse.[72]  She was diagnosed with panic disorder with agoraphobia and assigned a GAF score of 50.[73]  Guthrie was noted to be highly motivated to regain functioning.[74]

### 3.    Non-Examining State-Agency Psychologist, Donald Cochran, Ph.D.

On January 4, 2007, an electronically signed report attributed to state-agency psychologist, Donald Cochran, Ph.D., indicated that Guthrie had a marked limitation in her ability to interact appropriately with the general public, travel in unfamiliar places, or use public transportation.[75]  Dr. Cochran also noted that Guthrie had a moderate limitation in her ability to carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with others without being distracted by them; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.[76]  Dr. Cochran stated:

---

[69]  R. 485-97.
[70]  R. at 485.
[71]  R. at 491, 495.
[72]  R. at 495.
[73]  *Id.*
[74]  R. at 496.
[75]  R. at 199, 425-41.
[76]  R. at 439-440.

This is a borderline case. Given the [activities of daily living] report (driving and crowds seem to b[e] the main triggers for the panic), age and support system, it is . . . concluded that [Guthrie] could do simple work related tasks in an [environment] that did not require extensive social interaction or driving.[77]

### 4. Bhargavi Devineni, M.D.

On January 5, 2007, Guthrie saw her new psychiatrist, Dr. Devineni, and reported that, after a June 2006 car accident involving her parents, her panic attacks began to appear "out of the blue," usually triggered by driving, being in a car, or "watching television programs with a lot of emotional content."[78] The panic attacks lasted for ten to fifteen minutes, and occurred more than ten times daily in June 2006 , worsening through July and August 2006.[79] In September 2006, Guthrie's symptoms improved after being treated with Lexapro.[80] Guthrie reported she was "doing well with her panic attacks," to where she was having one panic attack per day but still experiencing low mood, such that she did not take showers for a few days per week and slept all day.[81] Guthrie further reported that she was not taking her full dose of Lexapro every day due to the sexual side-effects, and was reducing the dosage by half about three days per week.[82] Guthrie also reported that she was "very active with her church."[83] Dr. Devineni diagnosed Guthrie with panic disorder with agoraphobia; major depressive disorder, single episode; possible post traumatic stress disorder.[84] Guthrie was also noted to have obsessive compulsive personality traits, and Dr. Devineni assigned her a GAF score of 45.[85] Dr. Devineni decreased Guthrie's Lexapro dosage due to the sexual

---

[77] R. at 441.
[78] R. at 451.
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] R. at 452.
[83] R. at 453.
[84] R. at 454.
[85] *Id.*

side-effects, with a taper to Prozac.[86]

On February 8, 2007, Guthrie saw counselor Lambur again and reported that she was feeling worse since her last visit with Dr. Devineni, and experiencing increased anxiety and depression such that she was staying home most days with her child.[87]  Counselor Lambur noted that Guthrie was not functioning well at home, but that her mother and a friend were helping.[88]

On February 9, 2007, Guthrie saw Dr. Devineni and reported that her panic attacks were fairly controlled, occurring once per week.[89]  She further reported that the panic attacks lasted for about twenty minutes, but she would remain very anxious for a few hours after that.[90]  Guthrie also reported attempting to go out and do activities, such as going to church or driving a few blocks.[91]  Dr. Devineni diagnosed Guthrie with panic disorder with agoraphobia and major depressive disorder, single episode, and prescribed an increased dose of Prozac.[92]

On March 2, 2007, Guthrie saw counselor Lambur and reported decreased anxiety before 11:00 a.m. and going to bed as early as 7:30 p.m. to avoid the possibility of panic attacks.[93]  She reported that her panic attacks had decreased to twice a month with Prozac, and she was now able to grocery shop with assistance, but reported receiving strange looks due to her "verbalizations."[94]

On March 9, 2007, counselor Lambur noted that Guthrie missed her morning appointment

---

[86] *Id.*
[87] R. at 464.
[88] *Id.*
[89] R. at 449.
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] R. at 460.
[94] R. at 460.

because she did not have a ride, but attended her social security appointment in the afternoon.[95] During Guthrie's ride back from that appointment, her father called counselor Lambur due to Guthrie having a panic attack in the back seat of the car.[96] Guthrie was unable to speak on the phone, and paramedics were called.[97] On March 23, 2007, counselor Lambur spoke with Guthrie regarding missed appointments.[98] On April 25, 2007, Guthrie explained that she was worried that she would have to pay a fee for attending sessions.[99] Guthrie "expressed [a] desire to meet regularly" and promised to contact someone regarding financial assistance.[100]

On April 13, 2007, Guthrie saw Dr. Devineni again, reporting that she had only one panic attack after the last visit, though she had been staying home most of the time.[101] Guthrie explained that she would take her daughter to the park across the street for 30 to 40 minutes, and then return home when she started feeling like a panic attack was coming on.[102] Guthrie reported improved mood, was looking for a job, and had an interview scheduled for April 25th.[103] Dr. Devineni opined that Guthrie was responding to her medications and maintaining stability, with her panic attacks decreasing in frequency, but that Guthrie "does need therapy to learn relaxation techniques and would benefit from [cognitive behavior therapy]."[104] Guthrie was continued on Prozac, and assigned a GAF score of 35, with the highest score in the past year being 50.[105]

---

[95] R. at 461, 463.
[96] R. at 462.
[97] R. at 461-62, 470, 477.
[98] R. at 456, 458.
[99] R. at 455.
[100] *Id.*
[101] R. at 445.
[102] *Id.*
[103] R. at 446.
[104] *Id.*
[105] *Id.*

Counselor Lambur reviewed Guthrie's treatment plan on May 3, 2007, due to "ongoing symptoms of anxiety that impair her ability to function in all roles."[106]  At that time, it was noted that Guthrie's panic attacks had increased to four episodes per week, after having only two episodes per week prior to beginning work.[107]  Counselor Lambur noted that Guthrie reported a decrease in anxiety symptoms, and had just obtained full time work in customer service, though she worried about having panic attacks on the job and did not feel that she was ready for work, but was pushing herself.[108]  Counselor Lambur also noted that Guthrie was not coming in for therapy and was still not able to drive due to panic attacks.[109]  However, Guthrie could now sit up in the back seat and could help her son a little with homework.[110]  Guthrie reported being able to get out a bit more, but not being able to grocery shop due to becoming anxious at checkout.[111]

On May 3, 2007, Guthrie was evaluated by Dr. Deviveni for an updated treatment plan.[112]  Guthrie reported some improvement with decreased anxiety symptoms, and had just obtained full time work despite worries about having panic attacks on the job.[113]  Guthrie was still not able to drive or go to the grocery store, and did not feel that she was ready for work, but was "pushing herself."[114]

On May 4, 2007, Dr. Deviveni completed a form for the Commissioner, indicating that she had seen Guthrie once every month since July 2006.[115]  She reported that Guthrie alleged an inability

[106] R. at 481.
[107] R. at 482.
[108] Id.
[109] Id.
[110] Id.
[111] Id.
[112] R. 605.
[113] Id.
[114] Id.
[115] R. at 538.

to drive due to anxiety, inability to function, and sleeping most of the day, but also reported a decrease in the frequency of her panic attacks since beginning medicinal therapy.[116] Dr. Deviveni noted that Guthrie appeared committed to her children, and had an interest in church services, but had not been attending as much.[117] She noted that Guthrie was diagnosed with a panic disorder with agoraphobia with good response to medication resulting in a decrease in frequency of panic attacks; however, Guthrie was in need of more cognitive behavioral therapy for symptom management.[118] When asked to "describe the claimant's ability to do work-related activities" Dr. Deviveni opined that Guthrie "possesses appropriate verbal skills and intelligence to work. She is cooperative and would be able to work well with others."[119]

On May 7, 2007, counselor Lambur assisted Guthrie with a crisis intervention when she had a panic attack while training at her new job.[120] On July 3, 2007, Guthrie reported to counselor Lambur that she had tried to drive with her husband in the front seat and felt "boxed in," however, she felt that she was making progress because she could now go to the park for two hours.[121] Guthrie reported being able to be awake during the day but was still not doing household chores.[122] Guthrie also expressed a strong desire to work and drive again.[123]

5.      **Aleksandar Kondic, M.D.**

On August 3, 2007, Guthrie's new psychiatrist, Dr. Kondic, noted that therapist's records

---

[116] Id.
[117] R. at 539.
[118] R. at 541.
[119] Id.
[120] R. at 586.
[121] R. at 587.
[122] Id.
[123] Id.

reflected that Guthrie visited only four times in the past twelve months due to "transportation related anxiety."[124] Dr. Kondic noted Guthrie's reports of anxiety while in a car, but noted that Guthrie never appeared anxious while visiting, was "rather evasive," and "did not follow or ask[] for help as a [person] with severe anxiety would do," though she promised to become more compliant.[125] He further noted that Guthrie was now reporting using "up to 8 pills daily" of Ativan, and that her panic attacks usually prompted her parents to dial 911.[126] Dr. Kondic opined that Guthrie's current GAF was 55, and that ongoing treatment should continue in order to minimize disability and prevent severe decompensation.[127]

On September 7, 2007, Guthrie saw Dr. Kondic for therapy and medication management.[128] Guthrie was being prescribed Klonopin and Prozac; however, Dr. Kondic noted that Guthrie has had "multiple compliance issues in the past."[129] Dr. Kondic wrote that Guthrie "asked if she is able to work and she is, in my opinion," but he recommended giving only minimal information to her employer.[130] Dr. Kondic noted that Guthrie's diagnosis remained panic disorder with agoraphobia, and assigned her a current GAF score of 55, noting that Guthrie "will attempt to work full time."[131]

On February 22, 2008, Dr. Kondic completed a Mental Impairment Questionnaire, noting that he had treated Guthrie for one year, and she had panic disorder with agoraphobia and a current GAF score of 70.[132] Dr. Kondic noted multiple signs and symptoms, and further explained that

---

[124] R. at 545.
[125] *Id.*
[126] *Id.*
[127] R. at 546.
[128] R. at 542.
[129] *Id.*
[130] *Id.*
[131] R. at 543.
[132] R. at 548.

Guthrie's clinical findings included depression, suicidal thoughts, need for nonstop attention, weekly therapy, and a poor to fair prognosis despite being medicated with Klonopin, Celexa, Xanax, and previously with Prozac.[133] Dr. Kondic opined that Guthrie would be absent from work more than three times per month, and that she was "in no condition to work, find employment" and was simply "trying to resume [a] normal lifestyle."[134] He further opined that her mental abilities would be fair or poor in most work-related areas due to frequent panic attacks, suicidal thoughts, depression, and aggression.[135] Dr. Kondic explained that Guthrie is "medicated to maintain social functions of [a] semi-normal lifestyle."[136] He further opined that Guthrie had extreme limitations in her activities of daily living; moderate to marked limitation in maintaining social functioning; constant deficiencies in concentration, persistence and pace, and continual episodes of deterioration or decompensation in work or work-like settings that cause her to withdraw from that situation or experience exacerbation of signs or symptoms.[137]

On April 18, 2008, Counselor Lambur noted that Guthrie had not been consistent in attending her appointments, and had left several telephone messages for Counselor Lambur.[138] The messages indicated that Guthrie had separated from her husband, and was living with her mother.[139] Guthrie had indicated that she experienced an increase of symptoms after starting work and was no longer able to work.[140] Counselor Lambur sent a letter to Guthrie attempting to "link [her] back into services and provide more intensive treatment," and reassured Guthrie that there would be no fee

---

[133] R. at 549.
[134] *Id.*
[135] R. at 551.
[136] *Id.*
[137] *Id.*
[138] R. at 606.
[139] *Id.*
[140] *Id.*

for therapy with her, noting that Guthrie had "deep interpersonal issues that contribute to her anxiety" and "OCD tendencies to be explored."[141]

On May 2, 2008, Guthrie reported that she had obtained full time work until the end of May, and was "managing OK" despite an increase in anxiety.[142]  On May 13, 2008, Guthrie called and requested emergency assistance from counselor Lambur when she had a panic attack while driving home from work.[143]  Guthrie reported that she had been working for a call center for the past two months, and found it very stressful, but did not want to rely on disability payments.[144]  On May 14, 2008, Guthrie called counselor Lambur reporting anxiety at work and was concerned that she would experience a panic attack.[145]  Guthrie reported that she quit her job later that day.[146]  On June 27, 2008, Guthrie saw counselor Lambur reporting that she had a panic attack the prior morning, which was atypical because they tended to occur in the afternoon.[147]  Guthrie was no longer working and felt anxious.[148]  She was noted to be having four panic attacks per week.[149]

On July 30, 2008, Guthrie complained that her medications made her feel sleepy, and that she felt useless.[150]  She reported that she was not cleaning and could not fold or put her laundry away.[151]  Guthrie was observed to be depressed and tearful with poor focus.[152]  Counselor Lambur noted that Guthrie scored 33 of 45 on the Beck Depression scale and was sleeping a lot.[153]  For

---

[141] *Id.*
[142] R. at 589.
[143] R. at 588.
[144] R. at 588.
[145] R. at 590.
[146] *Id.*
[147] R. at 591.
[148] *Id.*
[149] *Id.*
[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] R. at 592..

reference, the Beck Depression Inventory is a 21-question self-report inventory for assessing depression; a score of 33 indicates severe depression.[154]  On September 3, 2008, counselor Lambur noted that Guthrie was late for her appointment, and reported that she felt tired all the time and did not want to get off the couch.[155]  Guthrie reported that she puts laundry in the washer, but will not get up to move it to the dryer, nor does she get up with her children before they go to school.[156]

On October 10, 2008, counselor Lambur described Guthrie's affect as blunted and noted that she was not functioning at home.[157]  Counselor Lambur advised Guthrie to meet with her every week, but due to Guthrie's "low energy levels," but agreed to meet with Guthrie every other week if Guthrie also called in between meetings.[158]  Guthrie was assigned a GAF score of 50.[159]

### 6.    Artur Sadowski, M.D.

That same day, counselor Lambur completed an updated treatment plan with Guthrie's new psychiatrist, Dr. Sadowski, noting that the goal of treatment was to have Guthrie return to work with limited mood episodes and no panic attacks for at least six months.[160]  Guthrie's current GAF score was listed as 50.[161]  Guthrie reported to counselor Lambur that she was "smiling on the outside but dying on the inside" and that her kids cared for themselves as she could not do household chores.[162]  She reported suicidal feelings, and a panic attack the prior week during a job interview.[163]  Guthrie

---

[154]   Beck AT, Steer RA, Ball R, Ranieri W (December 1996). "Comparison of Beck Depression Inventories -IA and -II in psychiatric outpatients."  Journal of personality assessment 67 (3): 588–97.
[155]   R. at 556.
[156]   Id.
[157]   R. at 554.
[158]   Id.
[159]   R. at 575.
[160]   Id.
[161]   Id.
[162]   Id.
[163]   Id.

reported that she was "pushing herself" to volunteer for ten hours per week at a resale shop, and that she wanted to work because money was tight, but felt that she could not.[164] Guthrie reported that she did not know if she felt sad or not; however, it was noted that she scored a 29 on the Beck Depression Scale.[165] Counselor Lambur noted that Guthrie improved 30 percent in the past two years, but needed continued care to improve overall functioning.[166] On October 29, 2008, Guthrie cancelled a therapy appointment with Counselor Lambur because she was feeling fine on Citalopram, and was volunteering at a clothing shop.[167]

Guthrie may have also seen Dr. Sadowski on November 11, 2008, as his January 2, 2009 treatment notes indicate that he saw Guthrie on this date and continued her on the medications Clonazepam and Citalopram.[168] However, there is no other documentation in the record for this visit.

On December 19, 2008, Guthrie saw counselor Lambur, reporting that her depression and anxiety were at a 9 out of 10, and that she was sleeping 16 hours per day and not caring for her house or children.[169] Guthrie also reported homicidal ideation due to anger with her sister and sister in law, and was noted to be depressed and anxious.[170] Guthrie's medication was reduced by half, and it was noted that she would soon be receiving home nurse visits to assist and monitor her.[171]

On December 27, 2008, counselor Lambur spoke with Guthrie while she was at Alexian

---

[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] R. at 553.
[168] R. at 563.
[169] R. at 571.
[170] *Id.*
[171] *Id.*

Brothers.[172]  Guthrie had first attempted to contact the counselor, but then visited the hospital after being unsuccessful.[173]  Guthrie was described as angry and irritable, and reported trying to hurt her husband because the television was too loud.[174]  However, she denied any current problems with mood.[175]  Guthrie also denied prior homicidal ideation when asked by the hospital social worker, which counselor Lambur noted was untruthful.[176]  Counselor Lambur spoke to Guthrie's husband, who reported that Guthrie did not seem angry or out of control that morning, but that she "usually appears calm but can feel something totally different."[177]  The hospital social worker informed counselor Lambur that Guthrie would not be committed, and her husband was reluctant to submit a petition for involuntary commitment.[178]

On December 30, 2008, Guthrie reported to counselor Lambur that she was no longer having homicidal ideation, but was depressed and having difficulty doing things.[179]  Also on December 30, 2008, counselor Lambur provided a narrative of Guthrie's treatment and an opinion regarding her functioning.[180]  She explained that Guthrie initially made progress in the reduction of her panic attacks when she started treatment in 2006; however, she was again functioning poorly.[181] Counselor Lambur noted that Guthrie "has struggled with being consistent in taking her medications as prescribed due to ambivalence about the source of her anxiety and dysfunction" and "initially believed she could get well on her own by using her support network and her faith."[182]  However,

---

[172]  R. at 572.
[173]  R. at 597.
[174]  R. at 572, 597.
[175]  R. at 595.
[176]  R. at 596.
[177]  R. at 573.
[178]  R. at 595.
[179]  R. at 574.
[180]  R. at 567-68; 581-82.
[181]  R. at 567.
[182]  *Id.*

during the past six months, Guthrie "has accepted that she has a mental illness that is interfering with her ability to function in all roles."[183] Counselor Lambur further explained it is difficult for Guthrie to express her emotions due to past trauma; "while experiencing anxiety or depressive symptoms, she externally appears calm."[184] In addition, due to her "difficulty trusting others, [Guthrie] 'acts well'" while in the psychiatrist's office, but was beginning to trust her counselor and express her feelings more.[185] Therefore, "the psychiatric notes tend not to reflect her actual status" and the counselor noted she was working more closely with the psychiatrist to provide "a more consistent view of her impairment and course of treatment."[186]

With respect to Guthrie's poor functioning, counselor Lambur noted that Guthrie made numerous attempts to work and "would call [Lambur] frequently from the job to help reduce symptoms of on the job panic attacks."[187] She noted that Guthrie has also been clinically depressed for the past seven months, and was "not functioning in the home at all" and sleeping most of the day, with recent suicidal and homicidal ideation.[188]

Counselor Lambur also completed a Mental Impairment Questionnaire, noting that she had provided therapy for Guthrie since November 2006, and that Guthrie was diagnosed with panic disorder with agoraphobia and depressive disorder, assigning a GAF score of 49.[189] Multiple signs and symptoms of depression and anxiety were noted, and counselor Lambur opined that Guthrie would be absent from work more than three times per month.[190] Guthrie's work abilities were rated

---

[183] *Id.*
[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] R. at 568.
[189] R. at 576.
[190] R. at 577.

20

as fair or poor in several areas.[191]  Counselor Lambur opined that Guthrie had a moderate limitation in activities of daily living and maintaining social functioning; frequent deficiencies of concentration, persistence, or pace; and continual episodes of deterioration or decompensation in work or work-like settings.[192]  Counselor Lambur explained that Guthrie is intelligent and skilled; however, "her emotional instability from her anxiety disorder is what hinders her from being successful."[193]

On January 2, 2009, Guthrie saw Dr. Sadowski and reported taking Klonopin and Citalopram.[194]  Guthrie had previously informed her counselor that she was experiencing episodes of anger and passive homicidal thoughts on the increased medication dosage.[195]  After her dosage had been decreased by half, Guthrie reported feeling better with no panic attacks the prior month and feeling less fatigued.[196]  However, Guthrie reported ongoing mood instability with increased irritability and anger, and requested a mood stabilizer to help lessen her depression.[197]  Guthrie was diagnosed with panic disorder with agoraphobia and a depressive disorder, and assigned a GAF score of 60.[198]  Dr. Sadowski also noted that Guthrie's highest GAF score in the past year had been 70.[199]  Her Klonopin and Citalopram were continued, and Lamotrigine was prescribed.[200]

On January 16, 2009, Dr. Sadowski completed a Mental Impairment Questionnaire, noting

---

[191]  R. at 578.
[192]  R. at 579.
[193]  *Id.*
[194]  R. at 563.
[195]  R. at 563.
[196]  *Id.*
[197]  *Id.*
[198]  R. at 564.
[199]  *Id.*
[200]  *Id.*

that he had treated Guthrie since July 2008, and that her GAF score was 55.[201]  He noted that Guthrie

suffered from a chronic illness, and would be absent from work more than three times per month.[202]

Dr. Sadowski opined that Guthrie's ability to perform mental tasks was fair to poor in most areas,

and explained that Guthrie had "multiple problems with jobs when due to anxiety or anger was not

able to communicate properly with coworkers and lost her job."[203]  Dr. Sadowski opined that Guthrie

had a moderate impairment in maintaining social functioning; often had deficiencies in

concentration, persistence, or pace; and had repeated episodes of decompensation in work or

work-like settings.[204]

## B.    The January 8, 2009 Hearing

Guthrie's hearing before the ALJ occurred on January 8, 2009, in Oak Brook, Illinois.

Guthrie appeared in person and was represented by attorney, Matthew Edwards.  The ALJ heard

testimony from Guthrie, as well as vocational expert ("VE"), Michelle M. Peters, and medical expert

("ME"), Kathleen M. O'Brien, Ph.D.

Guthrie testified first.  She stated that she had been unemployed since 2007.[205]  According

to Guthrie, her past employers dismissed her after she began having frequent panic attacks. [206]

Guthrie stated that her doctor initially attributed these disturbances to stress from trying to support

her parents after they were involved in a 2006 car crash, which left Guthrie's father hospitalized.[207]

---

[201]  R. at 608.
[202]  R. at 609
[203]  *Id.*
[204]  R. at 611.
[205]  R. at 174.
[206]  *Id.*
[207]  R. at 179.

Guthrie stated that being around people triggers her panic attacks, which typically last from 30 to 45 minutes and are characterized by heart palpitations, sweaty palms, suicidal thoughts, and compulsions.[208]  According to Guthrie, she has panic attacks "probably once a day," sometimes prompting her to call the crisis unit or her therapist, or to dial 911.[209]  Guthrie stated that she has panic attacks even while medicated and at home.[210]  While "[t]he medication does help sometimes," she "find[s] [her]self taking more [of it] than prescribed."[211]  When asked, Guthrie stated that her most recent panic attack occurred on December 27, 2008, causing her to be admitted to Alexian Brothers Hospital on a "homicidal and suicidal watch."[212]

Guthrie testified that she takes medication and sleeps all day while her husband is at work.[213]  Guthrie listed her medications as Citalopram, Clozapine, and "a new medication [she] can't pronounce."[214]  Guthrie stated that these medications cause her to experience drowsiness and depression.[215]  Guthrie further stated that she sleeps eighteen hours per day, "just to avoid the panic attacks," and spends the other six hours "in [her] room, listen[ing] to the books of the Bible on CD."[216]  Guthrie also testified that, about three days per week, she finds herself unable to get out of bed or bathe herself for fear of having a panic attack.[217]

Guthrie testified that she has a driver's license, but seldom drives.[218]  Guthrie stated that she

---

[208]  R. at 175.
[209]  R. at 176.
[210]  R. at 175-177.
[211]  R. at 180.
[212]  R. at 174.
[213]  R. at 172-173.
[214]  R. at 173.
[215]  *Id.*
[216]  R. at 177.
[217]  R. at 180.
[218]  R. at 173-175.

only drives to the grocery store down the street to "run in and run out" with a few items.[219] Otherwise, her husband is responsible for doing the grocery shopping,[220] and is also the primary caretaker for their children.[221]  Guthrie explained that she missed her therapist appointments during 2006 because she was afraid to go outside, but now attends them whenever someone can drive her.[222] Guthrie remarked that she must sit in the back seat of the car to avoid the "negative thoughts" that she experiences while sitting in the front passenger seat.[223]

When asked about her capabilities, Guthrie testified that she would be unable to work alone cleaning an empty office building.[224]  Guthrie explained that being away from home would take her outside of her "safety zone," and she fears being alone in the event of another panic attack.[225] Guthrie also added that attending the hearing made her feel "nervous, tired, sleepy, [and] worthless."[226]

The ALJ questioned Guthrie.  First, the ALJ asked Guthrie to explain the compliance issues described in Dr. Kondic's notes, including Guthrie's sudden discontinuance of her Prozac.[227] Guthrie responded that Prozac had increased the frequency of her panic attacks.[228]  Next, the ALJ asked how Guthrie cares for her children during summer vacation.[229]  Guthrie explained that her mother and sister usually take the children so that Guthrie can be alone.[230]  Finally, the ALJ noted

---

[219] R. at 178.
[220] Id.
[221] R. at 174-175.
[222] R. at 181.
[223] Id.
[224] R. at 181-182.
[225] R. at 182.
[226] Id.
[227] Id.
[228] R. at 183.
[229] Id.
[230] Id.

that Guthrie had worked full time in 2002 and 2005, but not at all in 2004.[231]  Guthrie explained that

she started feeling depressed in 2004, and began attending the Central Dupage Health Center for

treatment on weekdays from 8:00 a.m. to 5:00 p.m., but had not been given any medication.[232]

Next, the ME, a clinical psychologist, testified.[233]  The ME stated that Guthrie's impairment

of "panic disorder with some agoraphobia" was clearly established by the record.[234]  The ME

explained that, as of June 2006, the record demonstrated that Guthrie was experiencing severe panic,

but her condition later improved.[235]  The ME stated that in late 2006 and early 2007, Guthrie

reported "a great decrease in the panic" and became "non-compliant with treatment," taking herself

off of medications and missing appointments.[236]  The ME further stated that there was an instance

in the record where a treatment provider threatened to discharge Guthrie if she did not increase

compliance.[237]  The ME also stated that, after that incident, Guthrie engaged in "variable

compliance," which included not practicing her cognitive behavior therapy.[238]  The ME then pointed

to statements from Drs. Devineni and Kondic suggesting that Guthrie could work well with others

and was able to hold employment.[239]  The ME stated that the record did not contain "anything that

suggests that [Guthrie's] impairment has again become as significant as it was in 2006."[240]

The ALJ then questioned the ME.  First, the ALJ stated that he had been confused by Dr.

Kondic's notes, which gave an Residual Functional Capacity ("RFC") of disabled yet contained a

---

[231]  *Id.*
[232]  *Id.*
[233]  R. at 184.
[234]  *Id.*
[235]  R. at 185.
[236]  *Id.*
[237]  *Id.*
[238]  *Id.*
[239]  *Id.*
[240]  R. at 186.

relatively high GAF score of 70.[241]  The ME acknowledged the inconsistency and stated that Dr. Kondic's notes were not supportive of the RFC because Dr. Kondic had noted that Guthrie could return to work.[242]  The ME also noted that Dr. Devineni's notes stated that in May 2007 Guthrie would be able to work well with others.[243]  The ALJ then asked the ME if Guthrie's impairment posed any functional limitations.[244]  The ME explained that Guthrie "would do better in a work setting in which she had only incidental social contact and probably no public contact."[245]  The ME also noted that Guthrie would do better in a work environment with average – but not high – production quotas.[246]

Guthrie's counsel then questioned the ME.  Counsel asked the ME if individuals with some form of agoraphobia tend to be less compliant with appointments.[247]  The ME responded that she has noticed no general trend, except that in her experience, "the greater the severity of the symptomology, the more willing a client is to get the help they need."[248]  Counsel then asked the ME if the record contained any information to indicate whether improvement of Guthrie's condition had continued into 2008.[249]  At this, the ALJ inquired into the significance of a new exhibit dated September 3, 2008, indicating that Guthrie's therapist had encouraged her to attend more frequent sessions.[250]  Guthrie stated that she has been attending more talk therapy sessions: once per week at DuPage Health Department and once every three weeks with Dr. Kondic.[251]  In response to the

---

[241] *Id.*
[242] *Id.*
[243] R. at 186-187.
[244] *Id.*
[245] R. at 187.
[246] *Id.*
[247] R. at 188.
[248] *Id.*
[249] R. at 189.
[250] *Id.*
[251] R. at 190.

questions from counsel and the ALJ, the ME stated that the increased therapy sessions were an example of therapists "pushing [Guthrie] to become more involved" and nonetheless supported that she's had improvement.[252]

Counsel then directed the ME's attention to a note from the same date, which states that Guthrie had a blunted affect and was not functioning at home at all.[253]  The ME stated that the notation on Guthrie's functioning at home was merely a documentation of Guthrie's self-report, not observations of a treatment provider.[254]  The ME then stated that blunted affect would be caused by Guthrie's medication and it would only create "mild to moderate" limitations in concentration, persistence, and pace, as well as moderate difficulties with social interaction.[255]  After counsel asked if individuals with panic disorder become more prone to panic attacks outside of their environment, the ME replied that this might be a risk, but that following the treatment protocol could get the individual to a place where they "could function on an average level on an average day."

The VE testified next.  She noted that Guthrie had held substantial gainful employment during the years 2002, 2003, and 2005, and stated that Guthrie's jobs would have been customer service representative positions within the Dictionary of Occupational Titles ("DOT") semi-skilled range, at the light exertional level, with a specific vocational preparation time ("SVP") of four.[256]  The VE also noted that Guthrie had done some past work at the light exertional level, as well as some at the sedentary level.[257]

---

[252] *Id.*
[253] *Id.*
[254] R. at 191.
[255] *Id.*
[256] R. at 193.
[257] *Id.*

The ALJ then sought the VE's opinion on a hypothetical individual. In this hypothetical, the ALJ described a 31 year old woman with a high school education and one year of college, with "work experience as described in the testimony today," who has received treatment and a diagnosis of anxiety disorder causing panic attacks, suffers medication side effects of drowsiness, and has no exertional limitations, but would be limited to simple, repetitive tasks on the non-exertional level.[258] The ALJ added that this individual could have only incidental social contacts and no public contacts, and should not be involved in strict production quotas, but average production would be permissible.[259]

The VE stated that this hypothetical individual would not be able to perform Guthrie's past relevant work.[260] However, the VE noted that such a person could perform approximately 3,500 janitorial positions, 2,000 assembly positions, and 1,800 hand packaging positions.[261] The ALJ asked if those positions kept a "high productive type, fast movement assembly line pace," to which the VE responded that the numbers for these jobs had already been "significantly reduced" and "at the medium physical demand level . . . the high production quotas are not as significant as they would be at a sedentary level."[262] The VE then affirmed that her testimony was consistent with the DOT.[263]

Guthrie's counsel then questioned the VE. First, counsel added to the hypothetical that the individual would experience a 45 minute long panic attack one to two times per week, causing the

[258] *Id.*
[259] *Id.*
[260] R. at 194.
[261] *Id.*
[262] *Id.*
[263] *Id.*

individual to withdraw from working during the attack.[264]  The VE stated that this limitation would eliminate the positions she mentioned, and "would definitely affect the individual's ability to sustain that type of employment or any employment."[265]  Next, counsel asked if a person who was absent from work two times per month due to mental impairments could sustain the proffered jobs, to which the VE responded "[n]o."[266]  Counsel then asked if all jobs generally have some sort of "stress associated," to which the VE responded that "[e]ven your simple, repetitive types of positions, an individual could find . . .very stressful."[267]  Finally, counsel asked if an individual could sustain the proffered jobs if they were off task due to panic or medications twenty percent of the work week.[268]  The VE replied that the jobs could not be sustained.

Counsel concluded by stating that any improvement identified by the ME from 2007 did not reach a level where Guthrie could sustain full time employment; she went to the hospital for panic episodes in 2007 and her most recent records, submitted the date of the hearing, reflect a GAF score of 50.[269]  Upon counsel's suggestion that more recent information was available regarding the claimant's current treatment and condition, the ALJ offered counsel twenty additional days to supplement the record.[270]

III.    THE ALJ'S DECISION

In his February 13, 2009 opinion, the ALJ applied the Act's sequential five-step analysis and found that Guthrie was not disabled within the meaning of the Act and, therefore, was not entitled

---

[264] R. at 195.
[265] *Id.*
[266] *Id.*
[267] *Id.*
[268] *Id.*
[269] R. at 196.
[270] *Id.*

to DIB or a period of disability.[271]

To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[272] Substantial gainful activity includes work that a claimant did before the impairment and any other kind of gainful work generally available in significant numbers within the national economy.[273]

The social security regulations provide a five-step sequential evaluation process for determining whether a claimant is disabled.[274] During this process, the ALJ must determine: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether any of the claimant's impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[275] A finding of disability requires an affirmative answer at either step three or step five, while a negative finding at any step other than step three precludes a finding of disability.[276]

As an initial matter, the ALJ determined that Guthrie met the insured status requirements of

---

[271] R. at 159-67.
[272] 42 U.S .C. § 423(d)(1)(A).
[273] 42 U.S.C. § 423(d)(2)(A).
[274] 20 C.F.R. § 404.1520(a)(4).
[275] *Id.*
[276] *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

the Act through September 30, 2010.[277]  At step one, the ALJ found that Guthrie had not engaged in any substantial gainful activity since June 12, 2006, the alleged onset date, because Guthrie's earnings from work performed after that date did not rise to the level of substantial gainful activity.[278]  At step two, the ALJ found that Guthrie suffered from the severe impairments of panic disorder and agoraphobia.[279]

The ALJ then concluded at step three that Guthrie lacked any impairment or combination of impairments meeting or medically equaling those listed in 20 C.F.R. § 404, Subpart P, Appendix 1.[280]  The ALJ observed that Paragraph B could only be satisfied if Guthrie's mental impairment resulted in at least two of the following four limitations: "(1) marked restriction in the activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration."[281]  The ALJ noted the ME's testimony that Guthrie's mental impairment did not meet or medically equal the criteria of listing 12.06.[282]  After relying on the opinions of the ME and Dr. Cochran, a  non-examining state-agency psychologist who had prepared a Psychiatric Review Technique Form in January 2007,[283] the ALJ found that Guthrie did not have marked limitations in any of those four categories.[284]  The ALJ adopted Dr. Cochran's opinion that the medical evidence showed mild restriction in Guthrie's ability to perform activities of daily living, and moderate restriction in her social functioning.[285]  While Dr. Cochran had opined only mild

---

[277]  R. at 161.
[278]  *Id.*
[279]  *Id.*
[280]  R. at 162.
[281]  *Id.*
[282]  *Id.*
[283]  *See* R. at 199, 425-41.
[284]  R. at 162.
[285]  *Id.*

difficulty in maintaining concentration, persistence, and pace, the ALJ adopted the ME's testimony that Guthrie had "mild to moderate" difficulties in this category.[286] The ALJ further found that the record did not establish that Guthrie had experienced documented episodes of decompensation of extended duration during the relevant time period.[287]

The ALJ also considered whether the paragraph C criteria were satisfied and concluded that the objective medical evidence does not establish decompensation of an extended duration or "a complete inability to function outside of the claimant's home."[288]

Next, the ALJ assessed Guthrie's RFC.[289] The ALJ concluded that Guthrie could perform a full range of work at all exertional levels, but with the following non-exertional limitations: work involving simple repetitive tasks, episodes of morning drowsiness, no social contact, and not involving high production quotas.[290] In reaching this conclusion, the ALJ noted that he considered all of Guthrie's symptoms and the extent to which they comported with the objective medical evidence and other medical evidence pursuant to 20 C.F.R. 404.1529 and SSRs 96–4p and 96–7p.[291] In addition, the ALJ considered opinion evidence in reaching his conclusion pursuant to 20 C.F.R. 404.1527 and SSRs 96–2p, 96–5p, 96–6p and 06–3p.[292]

First, the ALJ noted Guthrie's testimony that her medications make her drowsy and she does not drive due to panic attacks, the most recent attack occurring on December 27, 2008. The ALJ further noted Guthrie's testimony that her past temporary jobs ended due to panic attacks

[286] *Id.*
[287] *Id.*
[288] *Id.*
[289] R. at 163.
[290] *Id.*
[291] *Id.*
[292] *Id.*

lasting 30-45 minutes, which were triggered by customer service work, and Guthrie must be medicated to go to the grocery store and deal with crowds to pick up a few items. The ALJ also noted that "[Guthrie] stated that she could perform after-hours work alone."

The ALJ found that Guthrie's medically determinable impairments reasonably supported Guthrie's alleged symptoms, but that Guthrie's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the RFC assessment.[293]    In supporting the RFC assessment, the ALJ noted that the ME testified that Guthrie had not been functional on the alleged 2006 onset date, but her condition improved by the end of 2006 and beginning of 2007.[294] The ALJ further noted the ME's testimony that Guthrie had begun a period of non-compliance, but possessed the RFC set forth by the ALJ when medicated.[295] The ALJ also noted that Guthrie's therapist listed Guthrie as being compliant with medications and therapy on November 27, 2006, and treatment notes from April 13, 2007, "show that [Guthrie] is responding to her medications and maintaining stability, her panic attacks have decreased in frequency, and she does not need therapy to learn relaxation techniques."[296] In addition, the ALJ noted that treatment notes from May 3, 2007, showed some improvement and Guthrie obtaining a full time job.[297]

The ALJ then referenced the May 4, 2007 Psychiatric Report of Dr. Devineni, a psychiatrist who had treated Guthrie monthly from June 2006 to June 2007.[298] The ALJ noted that Dr. Devineni

---

[293]  R. at 164.
[294]  R. at 164.
[295]  *Id.*
[296]  *Id.*
[297]  *Id.*
[298]  *Id.*

had opined that Guthrie possessed appropriate verbal skills and intelligence at work, and noted that Guthrie had a good response to medication, "is cooperative," and "would be able to work well with others."[299]

The ALJ observed that, in treatment notes from September 7, 2007, Dr. Kondic wrote that Guthrie "is maintained on Clonopin [sic] and has had multiple compliance issues in the past."[300] The ALJ noted that Guthrie had presented to Dr. Kondic as confident and cooperative and had reported feeling much better, with no panic attacks at all, was taking medication as prescribed, and experiencing no major side effects but some drowsiness."[301] The ALJ also noted Dr. Kondic's statement that Guthrie "asked if she is able to work and she is, in my opinion."[302]

The ALJ further observed that on September 3, 2008, Guthrie's therapist noted that she had explored Guthrie's lack of participation and "encouraged [Guthrie] that the best course of treatment is therapy and medications."[303] The ALJ also noted that January 2, 2009, treatment notes from Dr. Sadowski show that Guthrie's therapist had previously indicated Guthrie's problems with anger, passive homicidal ideation, and an admission by Guthrie that she had decreased medication on her own.[304] The ALJ observed that Dr. Sadowski had noted that Guthrie was doing much better in regard to her anxiety, reported being free of panic attacks, and feeling less tired, after her medication was back to normal.[305] The ALJ also observed that Guthrie had agreed to take her medication as prescribed and her "mental status exam was unremarkable and normal."[306]

---

[299] *Id.*
[300] *Id.*
[301] *Id.*
[302] *Id.*
[303] *Id.*
[304] *Id.*
[305] *Id.*
[306] R. at 165.

The ALJ then addressed the opinion evidence. The ALJ stated that he was affording greater weight to the opinion of the ME because it is "consistent with and supported by the objective medical evidence."[307] The ALJ afforded reduced weight to the opinion of Dr. Kondic, describing Dr. Kondic's mental RFC assessment as "internally inconsistent in that Dr. Kondic indicates that the claimant is severely restricted, yet has a [GAF] score of 70 which indicates mild symptoms and the ability to function pretty well."[308] The ALJ added that the score is inconsistent with his opinion in treatment records."[309] The ALJ also afforded reduced weight to the opinion of Dr. Sadowski, finding that his mental RFC assessment "is internally inconsistent in that it indicates that the claimant is severely restricted (missing more than three days of work a month) yet has a GAF score of 70."[310] The ALJ stated that, additionally, "the treatment records in the file are inconsistent with and do not support his assessment."[311]

The ALJ noted that "the claimant's therapist supports the opinion that the claimant is severely restricted in her ability to perform work or even function . . . [h]owever, as discussed above, the therapist discussed compliance issues with the claimant, encouraging her to be compliant with therapy and medication."[312]

The ALJ then summarized his findings by stating: "the above [RFC] assessment is supported by the objective medical evidence, including reports by the claimant and her treating physicians she is able to work when she is compliant and taking her medications . . .[t]he opinion of the [ME] also

---

[307] *Id.*
[308] *Id.*
[309] *Id.*
[310] *Id.*
[311] *Id.*
[312] *Id.*

supports this RFC assessment."[313]

Based on the RFC and the VE's testimony, the ALJ found that Guthrie was unable to perform any of her past relevant work as a customer service representative.[314]  The ALJ then noted that Guthrie was 29 years old on the alleged disability onset date, making her a younger individual under 20 C.F.R. 404.1563, and Guthrie had at least a high school education and could communicate in English.[315]  Considering Guthrie's age, education, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Guthrie can perform.[316]  Specifically, Guthrie could perform the representative jobs of a janitor, assembly worker, or hand packer.  Accordingly, the ALJ ruled that Guthrie was not disabled under the Act.[317]

IV.    STANDARD OF REVIEW

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[318]  The District Court will uphold the ALJ's decision if substantial evidence supports the findings of the decision and if the findings are free from legal error.[319]  Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate findings as to disability.[320]  However, the ALJ must build an accurate and logical connection from the evidence to his or her ultimate conclusion.[321]  While the ALJ is not required to discuss every piece of evidence, the ALJ must minimally articulate his reasons for crediting or discrediting

---

[313] *Id.*
[314] *Id.*
[315] *Id.*
[316] *Id.*
[317] *Id.*
[318] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[319] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).
[320] *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).
[321] *Dixon v. Massanori*, 270 F.3d 1171, 1176 (7th Cir. 2001).

evidence of disability.[322]

V.     ANALYSIS

Guthrie argues that the Court should reverse or remand the ALJ's decision because the conclusions of the ALJ were not supported by substantial evidence. In particular, Guthrie argues that the ALJ erred in: (1) according "reduced weight" to the opinions of Guthrie's treating psychiatrists; (2) failing to properly address the opinion of her therapist; (3) determining that Guthrie did not suffer a listing-level impairment; and (4) finding that Guthrie was not wholly credible. Guthrie also argues that her case should be remanded due to appearance of new and material evidence. As a threshold matter, we address Guthrie's argument for remand based on new evidence, before reaching her substantive challenges to the ALJ's opinion.

A.     **Guthrie's New Evidence**

Guthrie requests remand pursuant to sentence six of 42 U.S.C. § 405(g), arguing that new and material evidence has come to light. Under 42 U.S.C. § 405(g), the district court may remand a case to the Commissioner and order the Commissioner to consider additional evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."[323] Evidence is "new" if it was not available to the claimant at the time of the administrative hearing.[324] Evidence is considered "material" if there is a "reasonable probability" that the ALJ would have reached a

---

[322] *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).
[323] 42 U.S.C. § 405(g); *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993).
[324] *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1996).

different conclusion had he considered that evidence.[325] "Good cause" for failing to incorporate evidence into the record during an administrative proceeding exists where the claimant can demonstrate "a sufficient reason" for its absence.[326]

Guthrie argues that remand is warranted based on new evidence of her involuntary hospitalization following a suicide attempt. On March 4, 2009, Guthrie was admitted to Alexian Brothers, and later transferred to Glen Oaks inpatient psychiatric facility, after attempting suicide by overdose of medication.[327] It was noted that Guthrie had visited the ER the day before with a panic attack, and had been sent home after being there for several hours.[328] During her suicide attempt, Guthrie ingested 30 pills of Citalopram, after experiencing a panic attack that would not resolve.[329] Guthrie's son found her unresponsive and called 911.[330] Guthrie reported that she was "so tired of having panic attacks" and that her depression and anxiety were worsening.[331] Upon arrival at the ER, she started seizing, lost consciousness, and then later had to be restrained.[332] Guthrie was diagnosed with "major depressive disorder, severe; and panic disorder without agoraphobia."[333] During her two-day inpatient stay, Guthrie was assigned a GAF score of 45.[334]

The analysis here turns on whether evidence of Guthrie's March 4, 2009 suicide attempt was material to her condition at the time of the administrative proceeding, as there is no dispute that the

---

[325] *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999).
[326] *Lucio v. Barnhart*, 2004 WL 1664005, * (N.D. Ill. June 22, 2004).
[327] R. at 8-144.
[328] R. at 102.
[329] R. at 28, 75.
[330] R. at 77, 107, 138.
[331] R. at 77, 100.
[332] R. at 28, 71.
[333] R. at 101.
[334] *Id.*

evidence is "new," or that there is a sufficient explanation for its absence in the record.[335]  Guthrie

argues that the new evidence is material because it is "consistent with [Guthrie's] homicidal plans

and actions, and her comment [to counselor Lambur] that she was 'dying on the inside.'"[336]  Guthrie

also argues that her suicide attempt signifies the continuation of severe impairment, as documented

in the January 2009 treatment notes, and demonstrates that any perceived improvement in her

condition was not sustainable.[337]  In response, the Commissioner argues that the Court should view

Guthrie's suicide attempt as an isolated incident, contending that the evidence is not material

because it "relates to [Guthrie's] difficulties after the date of the ALJ's decision."[338]

Medical evidence postdating the ALJ's decision is material if it speaks to the patient's

condition on or before the issuance of the ALJ's decision, and therefore could have affected the

ALJ's determination.[339]  In the March 5, 2009 treatment notes from Guthrie's admission to Alexian

Brothers following her suicide attempt, the attending physician noted that:

> [Guthrie] felt overwhelmed and hopeless.  She says that her behavior was impulsive and out
> of character for her, but that she did definitely take the medication in a suicide attempt.  The
> patient does see a psychiatrist and has been working on adjusting her medications.  The
> patient reports that her constant anxiety also causes depressive symptoms and that her
> depression and anxiety are worsening lately.[340]

The physician further noted that Guthrie "has a history of suicidal ideation and homicidal ideation

in December 2008" but "[s]he was not admitted for psychiatric treatment at that time . . ."[341]

Contrary to the ME's testimony that Guthrie's condition was improving– which was accepted by

---

[335] *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005)
[336] Pl.'s Br. 14.
[337] *Id.*; Pl.'s Reply 2.
[338] Def.'s Resp. 13.
[339] *See, e.g., Sears v. Bowen*, 840 F.3d 394, 402 (7th Cir.1988); 20 C.F.R. 404.970(b).
[340] R. at 100.
[341] *Id.*

the ALJ – these treatment notes suggest that Guthrie's condition was entering a state of decline. More than this, Guthrie's suicide attempt appears to have occurred while Guthrie was compliant with treatment, thus challenging the ALJ's overarching theory that Guthrie is capable of performing work as long as she is compliant with her medications.[342]

As Guthrie points out, the Seventh Circuit has acknowledged in *Allord v. Barnhart* that evidence generated during a later time period may relate back to and clarify a claimant's condition during the relevant time period for assigning benefits.[343] Given Guthrie's documented history of chronic anxiety and depression, we cannot safely say that a suicide attempt occurring less than one month after the ALJ's decision was immaterial to Guthrie's condition at the time the ALJ made his determination. Consequently, we find that evidence of Guthrie's suicide attempt supports remand under 42 U.S.C. § 405(g), and should be considered by the ALJ.

## B.      The Opinions of Guthrie's Treating Physicians

Guthrie first argues that the ALJ reached flawed determinations at step three and the RFC assessment stages by failing to give controlling weight to the opinions of Guthrie's treating psychiatrists, Drs. Kondic and Sadowski.[344] Guthrie also argues that the ALJ overvalued the opinions of the ME and Dr. Cochran, two non-examining psychologists.[345]

An ALJ is required to determine what level of weight is accorded to the opinions of treating and examining physicians, and must explain the reasons for his finding.[346] Generally, the opinion

---

[342] *See* R. at 164.
[343] 455 F.3d 818, 822 (7th Cir. 2006)
[344] Pl.'s Br. 5.
[345] *Id.*
[346] *See* 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

of a treating physician who is familiar with the claimant's impairments, treatments, and responses will be given greater weight than a non-treating physician.[347] This "treating physician's rule" directs the ALJ to give controlling weight to the medical opinion of a claimant's treating physician if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence.[348] However, an ALJ may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or internally inconsistent, so long as he minimally articulates his reasons for crediting or rejecting the evidence of disability.[349]

In his written opinion, the ALJ accorded "reduced weight" to the opinions of treating psychiatrists, Drs. Kondic and Sadowski, on the basis that the Mental RFC Assessment prepared by each physician was "internally inconsistent in that it indicates that [Guthrie] is severely restricted, yet has a [GAF] score of 70."[350] The ALJ also found that "the treatment records in the file are inconsistent with and do not support [these] assessment[s]."[351] We begin by addressing Dr. Kondic's assessment, before reaching that of Dr. Sadowski.

### 1. Dr. Kondic's Assessment

In his February 22, 2008 Mental Impairment Questionnaire, Dr. Kondic made clinical findings including depression, suicidal thoughts, need for nonstop attention, weekly therapy, and a poor to fair prognosis despite being medicated with Klonopin.[352] Dr. Kondic opined that Guthrie

---

[347] 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).
[348] 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Bauer v. Astrue*, 532 F.3d 606, 608. (7th Cir. 2008)
[349] 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Clifford,* 227 F.3d at 871.
[350] R. at 165.
[351] *Id.*
[352] R. at 549.

was "in no condition to work" and that her mental abilities would be fair or poor in most work-related areas.[353] Dr. Kondic further opined that Guthrie had extreme limitations in her activities of daily living; moderate to marked limitation in maintaining social functioning; constant deficiencies in concentration, persistence and pace, and continual episodes of deterioration or decompensation in work or work-like settings.[354] Despite these significant limitations, Dr. Kondic assigned Guthrie a current GAF score of 70, which denoted the highest score in the 61-70 range, indicating some mild symptoms but "generally functioning pretty well and having some meaningful personal relationships."[355]

Guthrie argues that the ALJ erred in according reduced weight to Dr. Kondic's assessment on the basis of its internal inconsistency because a GAF score of 70 was "not necessarily inconsistent" with Dr. Kondic's notation that Guthrie was unable to work.[356] In support, Guthrie contends that GAF scores "'are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability.'"[357] While GAF scores are not conclusive evidence of disability,[358] they can be considered by the ALJ in assessing a claimant's functional capacity.[359] As the Commissioner points out, making a GAF rating requires a professional to "[pick] a single value that best reflects the individual's overall level of functioning."[360] Here, Dr. Kondic selected a GAF of 70 – indicating only mild symptoms – though Dr. Kondic concluded that

---

[353] R. at 551.

[354] *Id.*

[355] *American Psychiatric Association*, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition Text Revision (DSM-IV-TR), 34 (2000).

[356] Pl.'s Br. 5.

[357] Pl.'s Br. 5, quoting *Jaskowiak v. Astrue*, 2009 WL 2424213, *12 (W.D. Wis. Aug. 6, 2009).

[358] *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score") (internal citation omitted).

[359] *Hinton v. Astrue*, 2010 WL 3270050,*10 (C.D. Ill. Aug. 17, 2010)

[360] *See* DSM-IV-TR at 34.

Guthrie's symptoms prevented her from working.[361]  During the hearing, the ALJ noted the apparent tension between Dr. Kondic's treatment notes and his GAF score of 70, and raised the issue with the ME.[362]  The ME acknowledged that the GAF score was not consistent with Dr. Kondic's treatment notes.[363]  Under these circumstances, we find that the ALJ was entitled to consider the inconsistency between the GAF score assigned by Dr. Kondic and the other notations in the record in according reduced weight to Dr. Kondic's opinions..

## 2.     Dr. Sadowski's Assessment

In his January 16, 2009 Mental Impairment Questionnaire, Dr. Sadowski observed that Guthrie's highest GAF score in the past year was 70, but stated that her current score was 55.[364]  He noted that Guthrie suffered from a chronic illness, and would be absent from work more than three times per month.[365]  Dr. Sadowski also opined that Guthrie's ability to perform mental tasks was fair to poor in most areas, and she had moderate impairment in maintaining social functioning; often deficiencies in concentration, persistence, or pace; and repeated (three or more) episodes of decompensation in work or work-like settings.

While the ALJ was permitted to accord "reduced weight" to Dr. Kondic's opinion, the ALJ erred with respect to Dr. Sadowski, who did not list Guthrie's current GAF score as 70, but as 55. A GAF of 55 reflects only moderate symptoms or moderate difficulty in social or occupational functioning.[366]  Not only is this GAF score consistent with Dr. Sadowski's own assessment, which

---

[361] R. at 551.
[362] R. at 186.
[363] *Id.*
[364] R. at 608.
[365] R. at 609.
[366] *See* DSM-IV-TR at 34.

did not denote any extreme or marked limitations, it is also consistent with the record as a whole. Guthrie's GAF scores typically ranged from 35-55.[367]  In his opinion, the ALJ provides no other reason for according "reduced weight" to Dr. Sadowski's opinion other than the ALJ's belief that Dr. Sadowski had assigned a current GAF of 70, which is factually incorrect.  As such, the ALJ accorded "reduced weight" to the opinion of a treating psychiatrist without providing a proper basis.

In mistakenly according reduced weight to Dr. Sadowski's opinion, the ALJ committed harmful error.  In Dr. Sadowski's RFC Assesment, he opined that Guthrie would be absent from work "more than three times" per month due to mental impairments.[368] During the hearing, the VE testified that none of the proffered jobs of janitor, assembly worker, or hand packer would be available for someone who would be absent from work even two times per month due to mental impairments.[369]  Had Dr. Sadowski's opinion on this point been accorded controlling weight, it might have altered the outcome of the ALJ's RFC assessment, and consequently his decision.  On remand, the ALJ is instructed to reevaluate the weight accorded to Dr. Sadowski's opinion.

The Court notes that it has found other factual errors in the ALJ's description of the evidence.  For instance, the ALJ notes that "[Guthrie] stated that she could perform after hours work alone."[370]  However, Guthrie in fact testified to the contrary, specifically stating that she would be unable to perform such work because it would take her outside of her "safety zone," and she feared being alone in the event of another panic attack.[371]  In addition, the ALJ states that Dr. Devineni's

---

[367] Sequentially, Guthrie's GAF scores are 50 (R. at 521), 40 (R. at 383), 50 (R. at 317), 45 (R. at 454), 55 (R. at 546), 55 (R. at 543), 70 (R. 548), 35 (R at 446), 50 ( R at 557), 49 (R. 576), 55 (R. at 608).
[368] R. at 609.
[369] R. at 195.
[370] R. at 163.
[371] R. at 182.

April 13, 2007 treatment notes "show that claimant is responding to her medications and maintaining stability, her panic attacks have decreased in frequency and she does not need therapy to learn relaxation techniques."[372] In fact, the notes state that "she *does* need therapy to learn relaxation techniques *and would benefit* from [cognitive behavior therapy] for panic disorder."[373] We note that all of the ALJ's errors inure to the benefit of Commissioner, suggesting a narrow view of the evidence, and calling into question the ALJ's dilligence in evaluating Guthrie's claim.[374] As such, these errors further support our decision to remand.

## C.  Guthrie's Therapist

Guthrie argues that the ALJ failed to give proper consideration to the opinion of counselor Lambur, her therapist.[375] Guthrie acknowledges that therapists are not "acceptable medical sources" under SSR 06-3p, but argues that the ALJ failed to observe 20 C. F. R. § 404.1527(d) in making his decision, which states that "[i]nformation from . . . 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of impairment(s) and how it affects the individual's ability to function. . . ." In particular, Guthrie takes issue with the fact that the ALJ observed Dr. Kondic's notation that Guthrie "presented with a smile, [was] calm, and cooperative,"[376] but failed to acknowledge counselor Lambur's notation that Guthrie tended to portray herself as unimpaired and was "smiling on the outside but dying on the inside."[377]

The ALJ is not required to mention every piece of evidence in the record.[378] However, he

---

[372] R. at 164.
[373] R. at 499 (emphasis added).
[374] R. at 441.
[375] Pl.'s Br. 11.
[376] Pl.'s Br. 6; *see* R. at 164.
[377] Pl's Br. 7; *see* R. at 563, 575.
[378] *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

must "confront the evidence that does not support his conclusion and explain why it was rejected."[379] Here, the ALJ noted counselor Lambur's opinion that "[Guthrie] is severely restricted in her ability to perform work or even function."[380] However, the ALJ did not find counselor Lambur's opinion persuasive based on Guthrie's documented failure to be compliant with her course of therapy and medication during her treatment by counselor Lambur. We find that the opinion of Guthrie's therapist was, in fact, considered by the ALJ, and he adequately articulated a reason for rejecting it. Thus, the ALJ did not commit error in evaluating the opinion of Guthrie's therapist.

## D. The Listing Analysis

Guthrie challenges the ALJ's application of the Listing of Impairments. A claimant is disabled under the Act if the claimant has an impairment that meets or equals a listing-level impairment.[381] The claimant has the burden of demonstrating that she meets or equals the listing, and that her impairments satisfy all of the various criteria specified in the listing.[382] However, the Seventh Circuit has indicated that remand may be appropriate based on an ALJ's "perfunctory analysis" of the evidence bearing on listing criteria.[383]

Guthrie first argues that the ALJ improperly relied on the "unauthenticated and unreliable" medical assessment of state agency reviewing psychologist, Dr. Cochran, in concluding that Guthrie's severe impairments of panic disorder and agoraphobia did not meet or equal Listing

---

[379] *Indorato v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Kasarsky v. Barnhart,* 335 F.3d 539, 543 (7th Cir.2003) and *Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir.2003)). .

[380] R. at 165.

[381] 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1; *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

[382] *Ribaudo v. Barnhart*, 453 F.3d 580, 584 (7th Cir. 2006).

[383] *Id.* (citing *Barnett*, 381 F.3d at 668; *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *see also Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

12.06:[384] Guthrie contends that the ALJ erred in relying on the assessment of Dr. Cochran because his forms contained electronic (not handwritten) signatures, which categorized them as improperly signed under the rules outlined in the Social Security Program's Operational Manual System ("POMS") DI 26510.089.[385]

When Dr. Cochran completed his SSA-2506-BK and SSA-4734-F4-SUP forms in 2007, and indeed when the ALJ issued his opinion in February 2009, POMS DI 26510.089 required that medical evaluation forms have the actual, physical signature of the reviewing psychological consultant.[386] The rules specified that the typed name of a psychological consultant on an electronic message or worksheet was "not considered a true signature."[387] However, as the Commissioner notes, electronic signatures on those particular forms later became acceptable pursuant to an amendment that became effective on June 8, 2009.[388]

Although Guthrie does not cite it, 20 C.F.R. § 404.1519o provides that an "unsigned or improperly signed" examination report may not be used to deny benefits. This is because a signature verifies that "the medical source doing the examination or testing is solely responsible for the report contents and for the conclusions, explanations or comments provided with respect to the history, examination, and evaluation of laboratory test results."[389] An agency is bound by its own regulations.[390] While the Commissioner argues that the signature rules have now changed, and that requiring handwritten signatures has become "unrealistic," the fact remains that handwritten

---

[384] *See* Pl.'s Br. 9-10;  R. at 162
[385] Pl.'s Br. 9;
[386] *See* POMS DI 2610.089 (2003 version).
[387] *Id.*
[388] Def.'s Br. 5; POMS DI 26510.089(a)(4) (as amended).
[389]  20 C.F.R. § 404.1519n(e).
[390]  *Terry v. Astrue*, 580 F.3d 471 (7th Cir. 2009) (ALJ's reliance on unsigned report was reversible error).

signatures were the clear rule at the time the ALJ issued his decision. Thus, Dr. Cochran's assessment must be excluded from the evidence as an unsigned report.

Since we exclude Dr. Cochran's report on this basis, we need not reach Guthrie's argument that Dr. Cochran's report was also "unreliable" because it was prepared based on the limited evidence available in 2007. [391]

Once Dr. Cochran's report falls away, only the ALJ's reliance on the ME's limited testimony remains. The ALJ stated that "the [ME] testified that the claimant's mental impairment does not medically meet or equal the criteria of Listing 12.06."[392] However, the ALJ never asked – and the ME never stated – that Guthrie's impairments of panic disorder and agoraphobia did not meet or equal Listing 12.06. The ME agreed that 12.06 was the relevant listing, but then proceeded to discuss the perceived inconsistency within the RFC determinations of Guthrie's treating psychiatrists.[393] The closest the ME came to a paragraph B analysis was when the ME testified that Guthrie's anxiety medication would cause her to experience mild to moderate difficulties in the areas of concentration, persistence and pace, as well as moderate difficulties in social interaction.[394] However, as the Commissioner acknowledges, these are only two of the four paragraph B criteria, and the ALJ only expressly adopted the ME's conclusion regarding one: Guthrie's concentration, persistence, and pace.[395] The ME never addressed whether Guthrie's impairments affected her activities of daily living, or caused repeated episodes of decompensation, each of an extended duration. She also never addressed equivalency.

---

[391] *See* Pl.'s Br. 5
[392] R. 162.
[393] R. at 185-186.
[394] R. at 191.
[395] Def.'s Resp. 6 (the ME "testified regarding at least two of the B criteria").

Without Dr. Cochran's report, the ALJ's listing analysis is "perfunctory," and unsupported by substantial evidence. An ALJ must support all of his conclusions at step three with substantial evidence, and must consult a medical expert regarding whether a listing was equaled. As the Seventh Circuit has observed, "[w]hether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."[396] Accordingly, on remand, we instruct the ALJ to obtain admissible evidence supporting his determination at step three.

Guthrie also argues that the ALJ erred by failing to consider evidence that Guthrie met the requirements of Listing 12.04, *Affective Disorders*.[397] According to Guthrie, if Dr. Sadowski's opinion were properly considered, the criteria of Listing 12.04(A)(1)(a), (d), (e), and (f), and 12.04(B) would be met, thus satisfying Listing 12.04.[398] Part A of Listing 12.04 can be satisfied by, among other things, "depressive syndrome" characterized by the following symptoms: (a) anhedonia or pervasive loss of interest in almost all activities; (b) appetite disturbance with change in weight; (e) decreased energy; and (f) feelings of guilt or worthlessness. Just as with Listing 12.06, paragraph B of Listing 12.04 must be satisfied by two or more of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[399]

The Commissioner contends that the paragraph B criteria for both Listing 12.04 and Listing

---

[396] *Barnett*, 381 F.3d at 670; *see* 20 C.F.R. § 404.1526(b) ("[m]edical equivalence must be based on medical findings . . . [w]e will consider the medical opinion given by the Commissioner in deciding medical equivalence").

[397] Pl.'s Br. 8-11.

[398] Pl.'s Br. 10-11; Pl.'s Reply 5.

[399] Guthrie also argues that Listing Sections 12.06(A)(2), 12.06(A)(3), and 12.04(C)(3) would be satisfied if Dr. Kondic's opinion were given greater weight. *Id.* However, since we have already established that the ALJ was entitled to accord reduced weight to Dr. Kondic's opinion, we do not address this argument.

12.06 are identical, thus obviating the need for the ALJ to have also considered the paragraph B portion of Listing 12.04. We agree with the Commissioner, and do not find harmful error in the ALJ's failure to consider Listing 12.04, for depression, based on Guthrie's severe impairments of panic disorder and agoraphobia. We note that if Dr. Sadowski's opinions support a finding of disability as to Listing 12.06(B), the opinions would similarly support such a finding on remand as to Listing 12.04(B).

We, thus, remand for the ALJ's reassessment of whether Guthrie's impairments meet or equal Listing 12.06, in accordance with our above recommendations.

## E.    The ALJ's Credibility Determination

Guthrie argues that the ALJ improperly made a conclusory finding as to her credibility and, therefore, committed legal error.[400] Specifically, Guthrie alleges that the ALJ based his credibility finding on Guthrie's noncompliance with medication and treatment recommendations, "but failed to consider the context of and reasons for [Guthrie's] noncompliance, as is required."[401] In response, the Commissioner contends that the ALJ reasonably considered the record evidence of Guthrie's noncompliance and concluded that Guthrie's testimony of her symptoms was not wholly credible.[402]

An ALJ's credibility determination is generally entitled to special deference.[403] The Court will not overturn an ALJ's credibility determination unless it is patently wrong.[404] However, Social Security Ruling ("SSR") 96–7p requires that an ALJ's credibility determination contain specific

---

[400] Pl.'s Br. 12.
[401] *Id.*
[402] Def.'s Br. at 11.
[403] *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).
[404] *Id.* at 929 (citing *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)).

reasons that are supported by evidence in the record.[405]  It also requires that the determination be sufficiently specific as to what weight the adjudicator accorded to the individual's statements and the reasons for that weight.[406]  The ALJ may not draw any inferences about a claimant's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any information provided by the claimant, or contained in the record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.[407]  While the ALJ need not mention every piece of evidence in reaching his decision, the ALJ must build a logical bridge between the evidence and his conclusions.[408]

Guthrie takes issue with the ALJ's observance of various compliance notations, including: (1) Dr. Kondic's notes that "Guthrie has had compliance problems" and that he "discussed medication compliance" with Guthrie; (2) counselor Lambur's note that she "explored with [Guthrie] her lack of participation;" and (3) Dr. Sadowski's notes indicating that Guthrie "had increased her medication . . . on her own."[409]  Guthrie argues that, in evaluating these notations, the ALJ was also required to consider her "religious beliefs" and "financial limitations" as explanations for lack of compliance with treatment.[410]  The Commissioner contends, however, that the information in the record does not support any religious or financial barriers to Guthrie's compliance.[411]

With respect to religious beliefs, Guthrie points to a single comment in counselor Lambur's

---

[405] SSR 96–7p.
[406] *Id.*
[407] *Id.*
[408] *Villano*, 556 F.3d at 562.
[409] Pl.'s Br. 6; *see* R. at 164.
[410] Pl.'s Br. at 6.
[411] Def.'s Resp. 9-11.

December 2008 treatment notes, explaining that "[i]nitially, [Guthrie] believed that she could get well on her own by using her support network and her faith."[412]  As the Commissioner points out, the notation does not indicate what time frame is referred to by "initially," and seems to suggest only that Guthrie attempted to improve her condition without professional help, not that she necessarily had a religious objection to treatment.[413]  Consequently, we do not find error in the ALJ's failure to consider this notation in evaluating Guthrie's credibility.

Although it is a closer question, Guthrie's argument that the ALJ failed to consider financial barriers explaining Guthrie's noncompliance does not bear out.  While Guthrie can point to a few instances in the record where the financial issue was raised, it appears that she only missed a single scheduled appointment while waiting for financial assistance.[414]  Further, it is not clear from the record that treatment was ever unavailable to Guthrie based on finances, considering that her counselor gave her a contact to call about "discussing fee[s],"[415] and at one point, assured Guthrie that she would not have to pay any fee for therapy.[416]  Moreover, even if we were to assume that Guthrie's finances prevented her from being physically present at treatment sessions, Guthrie's finances would not explain her lack of compliance with medication dosage requirements or the lack of participation that is referenced in the record and by the ALJ.  On balance, we find that the ALJ did not err in failing to address evidence of Guthrie's financial situation.

VI.     CONCLUSION

---

[412]  Pl.'s Br. 6; R. at 567.
[413]  Def.'s Resp. 9.
[414]  R. 457, 482.
[415]  R. at 455.
[416]  R. at 606.

For the reasons set forth above, Guthrie's motion for summary judgment is granted [dkt. 25]. We, therefore, remand the case to the Social Security Administration for further proceedings consistent with this opinion.

SUSAN E. COX
U. S. Magistrate Judge

Dated: 7/22/11